RECEIVED
JAN 2 4 2001
CHAMBERS OF
U.S. DISTRICT JUDGE
ELDON E. FALLON

COPY IN CHAMBERS

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2001 JAN 29 PM 4: 15
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EDGAR F. McCRORY, III** | **CIVIL ACTION** |
| **VERSUS** | **NO. 00-0171** |
| **SEACOR MARINE, INC.** | **SECTION "L"** |
| | **HON. ELDON E. FALLON**<br>**MAGISTRATE 3** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ** * ** * * * * * *

## PRE-TRIAL ORDER

1.    This Pre-Trial Conference was held on the 29th day of January, 2001 before the

Honorable Eldon E. Fallon.

2.    **APPEARANCE OF COUNSEL:**

A. Remy Fransen, Jr. (T.A.) (Bar No. 5827)
**FRANSEN & HARDIN**
814 Howard Avenue
New Orleans, Louisiana 70113
Telephone: (504) 522-1188

John W. Robinson (Bar No. 11350)
1515 Lafayette Street
Gretna, Louisiana 70053
Telephone: (504) 362-6214
        **ATTORNEYS FOR PLAINTIFF, EDGAR F. McCRORY, III**

DATE OF ENTRY
JAN 3 0 2001

Fee
Process
X Dktd
CtRmDep
Doc.No.

William B. Hidalgo, T.A. (Bar No. 20220)
William B. Schwartz (Bar No. 11854)
**BURKE & MAYER (of counsel)**
1100 Poydras Street
20th Floor - Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 569-2900
**ATTORNEYS FOR DEFENDANT, SEACOR MARINE, INC.**

3.   **DESCRIPTION OF THE PARTIES:**

Edgar F. McCory, III is a Jones Act seaman, who was employed by the defendant,

Seacor Marine, Inc., on the date of the alleged accident, February 1, 1999.

Seacor Marine, Inc. is a foreign corporation authorized to do and doing buisness in

Louisiana, within the jurisdiction of the court, and was the owner and operator of the M/V

SEACOR ENERGY, an anchor/supply boat, upon which Mr. McCrory was employed as a

qualified member of the engineering department (QMED) at the time of the accident.

4.(a)   **JURISDICTION:**

Jurisdiction and venue have been established.  Plaintiff's claim is brought under the

Jones Act (46 U.S.C. §688, *et seq.*), and the General Maritime Law, having been designated

as such under Rule 9(h).

5.   **PENDING MOTIONS:**

No motions are pending or contemplated at this time.

6.   **BRIEF SUMMARY OF MATERIAL FACTS:**

a.   **PLAINTIFF:**

2

Mr. Edgar F. McCory, III was a Jones Act seaman on the Seacor Marine, Inc. anchor/supply boat, SEACOR ENERGY, serving as a qualified member of the engineering department (QMED). He was injured on February 1, 1999 when a kamlock cap blew off of an above-deck piperiser leading to a below-deck pneumatic ("P") storage tank. The plaintiff had been instructed to prepare the tank for loading, which required him to release the pressure inside the tank. There were two piperisers to the tank, a vent and a fill line. The configuration of each of the piperisers was such that it had a kamlock cap attached to the end above deck. The kamlock cap was basically a dust cover, which was equipped with two "ears" for quick release. Although not reflected on the original plans, the kamlock in question had a ball valve counter sunk into the cap. Apparently the purpose of this ball valve was to allow venting of the riser between the butterfly valve at decklevel and the kamlock. Evidence indicates there is not supposed to be any leakage from the tank into the butterfly kamlock area. (Capt. Foret, depo. 66). This condition was a contributing cause of the accident. Plaintiff was simply not made aware of this factor.

Mr. McCrory first opened the ball valve on the kamlock cap of the forward vent line riser on the No. 1 port side pneumatic (P) tank, and then removed the kamlock cap. He next opened a butterfly valve which was located on the riser between the kamlock cap and the deck above the tank. This allowed the pressure in the "P" tank to escape through the riser. Pressure vented for about 20 minutes. Plaintiff then checked the pressure gauge in the wheelhouse, which registered zero.

3

When he attempted to remove the defective kamlock on the aft fill line riser, the cap blew off without warning, hitting him in the right hand and chest, throwing him onto the deck and into a winch stanchion. This caused injury to his hand, forearm, head, low back, shoulder, and neck.

The evidence will establish that the aft butterfly valve was defective. Pressure is not supposed to build up between the closed butterfly valve and the kamlock cap. Thus there was an unintended leak from the tank through the butterfly valve into the riser beneath the kamlock. Additionally, the kamlock cap on the aft riser was defective, in that the release ears were broken off, and the handle to the ball valve was likewise missing. The cap could only be removed by using tools, the release ears being useless. The ball valve handle was also missing, thus making it difficult if not impossible to visually determine if the ball valve were open or not. Additionally, the bulk mud and cement transfer procedures devised by Seacor do not call out any requirement to vent the aft fill riser after the tank itself has been vented, nor does it warn of any danger in removing the cover on the fill line without opening that ball valve. Even though Mr. McCrory had never been shown this printed procedure nor instructed on it, he effectively followed the procedure when he vented the tank. In addition, the kamlock was not secured by a safety chain. These combined unseaworthy conditions directly contributed to the accident.

There was also a failure to properly instruct Mr. McCrory in this particular task. In fact, there was a printed procedure, but recent testimony from the company safety engineer, Henry McCann, shows that even if the plaintiff had followed that designated procedure, the

4

accident would still have occurred because of the deficiencies in the appurtenances of the aft fill riser, particularly the leak in the butterfly valve.

The defendant has suggested an element of comparative negligence. The plaintiff was provided with a cramped and restricted workplace. Because of his size, he could not approach the risers in any other way. The configuration of the risers was such that the kamlock cap could not be removed from the side, because of the defective quick release ears. Plaintiff, a seaman, did his best to follow his orders with the equipment at hand, which was defective and inadequate.

The evidence, particularly the testimony of the chief engineer, Gerald Daigle, will show the following:

a.    The quick release ears on the aft kamlock were both broken flush with the cap. (Daigle depo. p. 61).

b.    They had to be pried open with a screwdriver or hammer because the quick release ears were inoperative. (Depo. p. 62).

c.    It was company policy to replace broken kamlocks or ears, but this was not done in this instance. (Depo. p. 64).

d.    The attached ball valve handle was broken off, so there was no outward indication of whether the valve was open or shut. (Depo. pps. 67-68).

e.    The ball valve handle is not supposed to be turned with pliers, but there was no other way to do the job. (Depo. p. 75).

f.    Apparently pressure got into the riser between the butterfly valve and the kamlock cap, showing that there was an improper leak in the butterfly valve.

The wheelhouse tank gauge was at zero, showing no tank pressure. Apparently pressure had improperly built up between the butterfly valve and kamlock cap because of a leak in the valve. (Depo. p. 74).

g.    There was no warning or training given to alert an employee of this potential danger. (Depo. pps. 74-75).

h.    There was supposed to be an instructional manual, but neither plaintiff not the engineer ever saw it. (Depo. p. 52).

i.    With the ball valve handle broken, the only way to know whether it was open or closed was "... one thing that a lot of experience has to do with." (Depo. p. 52).

j.    Captain Foret stated there should be no pressure between the butterfly and the kamlock unless the butterfly valve was leaking. (Foret, Depo. p. 66).

### INJURY

Mr. McCrory has been treated by the following health care providers, among others:

a.    Dr. Larry Fields of Mississippi Sports Medicine and Orthopaedic Center;

b.    Dr. William Long of Copiah Medical Associates, Hazelhurst, Mississippi;

c.    Dr. D.C. Mohnat, a neurologist;

d.    Dr. David Mielke of Tulane University Hospital & Clinic, psychiatrist;

e.    Dr. Robert M. McGuire, Jr., an orthopaedist in Jackson, Mississippi, on one consult;

f.    Dr. A.S. Wee, a neurologist in Jackson;

g.    Dr. Fawaz Abdrabbo, follow-up for alcohol dependency treatment;

6

h.    Susan Andrews of New Orleans, neuro-psychological testing;

i.    Corinne Queen Sampson, physiotherapist, Copiah Rehab-Hardy Wilson Memorial Hospital, Hazelhurst, Mississippi.

Total medical expenses of which we are currently aware exceed $83,000.00. Some, but not all, of these expenses have been paid by the defendant. Plaintiff has requested an accounting of all payments made under "cure". Please see the outline of Mr. McCrory's damage claim under "cure" that is set out below.

Mr. McCrory has suffered the following injuries:

1)    Left shoulder injury, including a traumatic detachment of the anterior labrum, (Dr. Field), resulting in two arthroscopic shoulder surgeries in July, 1999 and July, 2000. These surgeries involved debridement, acromioplasty, distal clavicle excision, tenodesis and anterior labrum stabilization. Plaintiff is still under treatment, and has not yet been released to return to work. He has in the past and is still undergoing extensive physiotherapy for the shoulder problems;

2)    A compression fracture at lumbar-vertebra 5 has been diagnosed on MRI. (Dr. Flower; Dr. Wee) Dr. McGuire feels it is a Schmorl's node. Either condition can result from trauma. He also had arthritic changes in his back, which were aggravated by the trauma. Complaints of low-back symptoms initially arose in February, 1999. Plaintiff was symptom free before the accident.

3)    Plaintiff initially showed objective signs of physical injury in the emergency room. (South Cameron Memorial Hospital).

7

4)    Neuro-psychological testing in July, 1999 showed that the plaintiff "... is exhibiting some symptoms that are consistent with a mild frontal lobe dysinhibition and post concussion syndrome." (Andrews).

5)    Plaintiff is under regular psychiatric care, suffering major depression and anxiety. (Dr. Mielke). This diagnosis was confirmed by the defendant's designated psychiatric expert, Dr. Thompson.

6)    Plaintiff was confined to Mississippi Baptist Medical Center for treatment for alcohol and drug-related problems. Although plaintiff had over-indulged in alcohol in the past, claim is now made that this rather drastic result was brought about as a direct consequence of the February, 1999 injury. The defendant's psychiatrist noted that plaintiff used medications in combination with alcohol "... in order to get high on these medications and avoid pain symptoms."

7)    Plaintiff shows significant limitations on functional capacity evaluations, muscle testing and range of motion.

## LOST EARNING CAPACITY

Thomas J. Meunier, Jr., a vocational rehabilitation counselor, concluded that if and when Mr. McCrory could return to work with medical clearance, it would be in lighter duty, semi-skilled work because of his medical restrictions. He concluded that plaintiff had sustained at least a 60% loss of wage earning capacity, which was probably permanent in nature.

8

The vocational expert selected by the defendant, Ms. Elvir, noted that an earlier physical capacity evaluation indicated that Mr. McCrory could sustain only light work. Under the medical reports, he was restricted from lifting over 5 to 10 pounds. This expert felt that plaintiff's earning capacity could possibly range up to a high of $33,529.60.

Mr. McCrory was originally employed as a chief engineer, which is a Coast Guard licensed position (DDE). The pay rate of that job was $250.00 per day, or an annual wage of $60,750.00. In January, 1999, because of questions about the certification of the licensing school that he had attended, the Coast Guard determined that Mr. McCrory needed 120 days of further sea duty to retain his licensure. Pending completion of that requirement, plaintiff became a QMED on SEACOR ENERGY. His wage was reduced to $125.00 per day, or $30,375.00 annually, pending sea time and reinstatement. Testimony at the 30(b)(6) deposition indicates that plaintiff could reasonably have expected to return to the higher wage upon completion of this requirement.

Dr. Melville Z. Wolfson's economic analysis, (for whom Dr. Thomas Dalton will testify), was:

| | |
|---|---|
| Past lost earnings (with reduction for 120 days at lower rate)......$ | 89,424.00 |
| Employer meal cost ................................................................. | 4,076.00 |
| Future loss was discounted in alternatives, namely: | |
| Without return to work....................................................... | 1,011,140.00 |
| After credit for minimum wage......................................... | 829,729.00 |
| Employer meal costs.......................................................... | 37,457.00 |
| Fringe benefit contributions by the employer.................. | 146,765.00 |

Based upon the vocational rehab testimony, if Mr. McCrory suffers a 60% diminution in earning capacity, the present value of the future loss would be $606,684.00. With past loss included, even without fringes, lost wage is almost $700,000.00.

The opinion of the defendant's vocational expert was that plaintiff might earn up to a high $33,000.00 upon return to work. That figure results in a future loss in excess of $450,000.00. Under that scenario, past and future wage loss exceeds $540,000.00, without fringes being calculated.

It is the consensus of all experts that at this time, Mr. McCrory is not able to return to any type of employment. When and if he recovers, he will never return to heavy offshore seaman's work.

### MAINTENANCE AND CURE

Mr. McCrory has been paid some maintenance and some cure, but these payments have been interrupted and/or temporarily denied on several occasions. Plaintiff submits that there will be testimony indicating that the delay in providing funding for physician-recommended treatment resulted in a worsening of plaintiff's condition. An issue whether damages would be due for wrongful delay and/or denial of recommended treatment will therefore be presented at trial.

### B.    Defendant, SEACOR MARINE, INC.

At the time of the accident in February of 1999, plaintiff was assigned to the M/V SEACOR ENERGY, a combination anchor handling/supply boat. Plaintiff had been assigned to that vessel since late July 1998. He worked with two engineers, Spencer Frederick and Gerald Daigle. On the day of the accident, the SEACOR ENERGY was manned by Captains Timmy Foret and Carlos Foss and engineers Gerald Daigle and plaintiff.

The SEACOR ENERGY is equipped with four large 1500 cubic foot pneumatic tanks which are located below the deck, aft of the accommodation quarters on the vessel. There

are two tanks on the port side and two on the starboard side. Each tank may be accessed by a manhole cover located on the back of the vessel. In addition, each tank has a four inch vent and fill line is used to load and discharge bulk cement.

The vent and fill lines run from the top of each pneumatic tank, through the deck and extend for approximately four feet above the deck. The lines are by then angled aft at approximately 45 degrees. They are capped off with a four inch cam-lock, which is a quick release cap held in place by two locking arms. Each line has two valves. The first is a butterfly valve which is in the four inch line and is located near the deck. The second is a small, one inch ball valve which is screwed into the center of the cam-lock cap. The butterfly valve is opened or closed to allow the actual discharge or loading of the cement. The purpose of the small ball valve in the cam-lock cap is to assist in bleeding the pressure from the vent lines.

These tanks are maintained under a constant pressure of approximately 10 to 15 psi to ensure that no water enters the tanks through the manhole covers. If any work is to be done on the bulk tanks, it is necessary to bleed of the pressure. Seacor had written procedures regarding work on the pneumatic tanks. The relevant steps to that procedure are as follows. The butterfly valve should be closed on both the fill and discharge lines, and then the small ball valve should be opened. This would release the pressure which builds up between the four inch butterfly and the cam-lock. After opening the ball valve, it should be manually checked to ensure that it is not plugged. Once all the air is bled off, the cam-lock fitting should be removed, and the four inch butterfly valve should then be opened slowly to allow all pressure in the tank to bleed off.

On February 1, 1999, plaintiff had been instructed by the Chief Engineer, Gerald Daigle to open all four bulk pneumatic tanks. Plaintiff testified that he had successfully opened tank numbers three and four. He then began to work on the No. 1 tank. Plaintiff first vented the fill line on the number one tank. To do this, he opened the small ball valve in the cam-lock cap, released the pressure, removed the cap and then opened the four inch butterfly valve slightly and allowed the pressure to bleed off of the tank. He went back to the deck and attempted to open the ball valve on the cam-lock cap on the vent line to the number one tank. He testified that the handle on the ball valve was missing and it was necessary to turn the valve with a pair of pliers. He believed he opened the valve to the fully open position and that there was no pressure behind the cam-lock because he did not hear any air escaping. Plaintiff then attempted to remove the cam-lock cap. He claims that the two locking arms on the cap were broken and that he could not open them normally. He testified that he got a screwdriver and began to pry the locking arms open, when the cap suddenly burst off of the vent line, striking him in the hand and chest and knocking him backwards against the tugger winch which was several feet away.

Mr. Daigle, the chief engineer on the vessel, was asleep at the time of the accident and first learned of it when plaintiff reported to him a short time after it had occurred. He observed a small abrasion on plaintiff's right hand and stated that it did not appear to have been swollen. Mr. Daigle completed the work on the number one pneumatic tank. The following morning Gerald Daigle found the cam-lock cap and both of the locking arms on the cam-lock cap were broken and the handle on the ball valve was also missing. When he picked up the cap, Mr. Daigle could visually observe that the ball valve was in the closed

12

position. Mr. Daigle testified that he was able to easily manipulate the valve and open and close it. The SEACOR procedure for bleeding of these pneumatic tanks states that a welding rod or some other object should be run into the ball valve to ensure that it is free from obstructions.

The accident would not have occurred if plaintiff had followed the procedures as he had been taught by the engineers on the SEACOR ENERGY. First and foremost, plaintiff knew the system was maintained under constant pressure and should not have stood in front of the cam-lock cap while attempting to remove it. There was sufficient space in the area of the No. 1 pneumatic tank so that plaintiff could have stood behind the risers and removed the cam-lock cap. If this had been done, then the cap would have never struck plaintiff. In addition, if plaintiff had checked the ball valve for obstructions, he would have noted that the ball valve was closed and that the pressure had not been relieved from the riser. Based on plaintiff's failure to stand behind the riser while removing the cam-lock cap and his failure to check the valve as instructed, plaintiff bears most, if not all of the responsibility for this accident.

To rule on liability, the court will only need to hear from a few witnesses. In contrast, the medical aspect of this case will involve the testimony of at least fourteen witnesses and voluminous medical documentation. To complicate the matter, with the exception of the first shoulder surgery, plaintiff has virtually no objective findings to support his myriad of medical complaints and therefore there is a wide disparity of opinions regarding his various medical conditions and the relationship to the accident of February 1, 1999.

A prime example of the lack of objective findings to support his medical condition is plaintiff's low back. In June of 2000, plaintiff presented himself to the emergency hospital in Jackson, Mississippi, complaining of extreme low back, weakness in both lower extremities, urinary frequency, and occasional bowel incontinence. Based on plaintiff's complaints Dr. Wee, the neurologist, suspected a possible compression of the spinal cord which would require immediate surgical intervention. Dr. Wee performed x-rays, a lumbar CT scan, a thoracic CT scan, a lumbar MRI and two different sets of electrodiagnostic studies on the nerves in plaintiff's leg. All of these tests came back negative and Dr. Wee said there was no neurologic basis for plaintiff's complaints of pain and referred him to Dr. McGuire, an orthopedist. Dr. McGuire testified that other than some degenerative conditions he would expect to find in someone of plaintiff's age and weight, there were no objective findings which would cause the symptoms of weakness in the lower extremities, urinary frequency and occasional bowel incontinence. Both Drs. Wee and McGuire testified that from a neurologic standpoint and orthopedic standpoint there is nothing to prevent plaintiff from returning to any form of heavy and manual labor.

Plaintiff will also attempt to prove to this Court that he had problems with alcohol following the accident and that his inpatient treatment are solely related to the accident on the SEACOR ENERGY. Plaintiff's history demonstrates otherwise. When he was in inpatient treatment in Jackson, Mississippi in Spring of 1999, plaintiff reported that his father, step-father, brother, and grandfather were all alcoholics and that he himself began to drink at the age of 6 and began to use marijuana when he was 7. He admits to using and abusing alcohol, marijuana, acid, opium, cocaine, pills and other narcotics. Plaintiff reported

that while he was in the Navy he had problems with alcohol and drugs and under went three separate inpatient treatments, two in 1985 and one in 1995. He stated that the longest he had ever been sober was eighteen months. He received at least one DWI and spent thirty days in jail for that crime. He also stated that he and his wife had separated as a result of his drinking.

Plaintiff also reported a history of physical abuse as a child, with two to three trips to the hospital for injuries he received and that on one occasion his father threw him out of a second story window. Dr. Thompson, the psychiatrist who examined plaintiff on behalf of Seacor believes that most, if not all of plaintiff's depression is a result of his alcoholism and does not believe that the accident was a cause and fact of the drinking after the accident or the inpatient treatment. In addition, Dr. Thompson believes that part of the depression may be as a result of the problems between the plaintiff and his wife which were caused in large part when plaintiff's wife learned that he had frequently used prostitutes while he was in the Navy.

As far as the psychiatric diagnosis is concerned, Dr. Thompson believes that McCrory has a good prognosis, that he should be tapered off of his pain medications, and there should be a minimal need for the number of neurological and psychiatric medications used to manage his present symptomatology. Dr. Thompson will testify that he believes the headaches are related to plaintiff's depression. While Dr. Thompson does believe that plaintiff has suffered a bout of major depression, he questions the link between the accident of February 1999 and the psychological conditions. The primary concern is the "faked bad profiles" on both of the MMPI's administered by Drs. Black and Andrews. Furthermore, the

15

fact that McCrory's story about the accident appears to vary from one account to the next making the accident sound more serious as time goes on and the fact that McCrory appears to have the maximum subjective symptoms and minimal objective findings on his evaluations suggest that these complaints are exaggerated.

Dr. Larry Fields is the orthopaedic surgeon who performed the two surgeries on plaintiff's left shoulder. Dr. Fields' performed shoulder surgery on plaintiff in July of 1999, which surgery consisted of removal of a lipoma, repair of the inflamed rotator cuff, a distal excision of the clavicle, and an acromioplasty. During the July 1999 arthroscopic procedure, the doctor was able to visualize the biceps tendon and there was no evidence of any fraying or inflammation of that tendon. Further, Dr. Fields' does not believe the lipoma is in any way related to the accident. Plaintiff underwent a course of physical therapy and in January of 2000, Dr. Fields' released plaintiff to return to full duty, without any restrictions.

Shortly thereafter, plaintiff returned to Dr. Fields complaining of shoulder pain focused in the area of the biceps tendon. Dr. Fields' treated plaintiff conservatively without success and ultimately performed a second surgery in July of 2000. In that procedure, the doctor was able to observe the rotator cuff, the clavicle, and the acriomion. He reported there were no problems related to the first surgery. However, he found significant inflammation and fraying of the biceps tendon, which was repaired. While Dr. Fields does not know what caused the fraying of the biceps tendon, he believes it may have been caused by the physical therapy plaintiff underwent following the first surgery. The physical therapist who provided plaintiff with his physical therapy testified that none of the exercises plaintiff performed would have caused a biceps tendon to fray. In addition, in her twenty

16

years of experience, treating hundreds of patients with the same surgery plaintiff had, she has never had a patient whose biceps tendon frayed as a result of physical therapy.    As of January 12, 2001, Dr. Fields had not expressed an opinion regarding plaintiff's disability or work restrictions.

Dr. Mohnot is the neurologist who began treating plaintiff in April of 1999 at the request of his attorney, Mr. John Robinson. Dr. Mohnot treated plaintiff through October 3, 2000. Plaintiff was scheduled to see him in December of 2000, but missed his appointment and no return date has been scheduled as of this time. As of October 2000, Dr. Mohnot's diagnosis was post-traumatic headaches, neck pain, cervical radiculopathy and possible right carpal tunnel syndrome.   Dr. Mohnot testified that based on his experience, that if a patient's post-concussive headaches have not resolved within twelve months, that they may be permanent in nature. However, Dr. Mohnot does admit that headaches of the type that plaintiff is suffering from can be associated with depression.

Dr. William Martin, a board-certified neurologist, examined McCrory on behalf of Seacor. He noted that Dr. Mohnot had performed an extensive evaluation in attempt to determine the source of plaintiff's chronic pain syndrome.  That evaluation consisted of a normal MRI of the brain, two normal cervical MRI's, normal nerve conduction velocity studies, and an EEG and Spect Scan of the brain. Dr. Martin noted that none of these studies indicated any evidence of injury to the brain or spinal cord and stated that his examination of plaintiff and his review of the medical records did not reveal any evidence of trauma to the nervous system which would result in the pain as described by McCrory.

17

Dr. Martin does not believe the headaches were a result of the accident based on the normal MRI and the neuropsychological testing done by Dr. Black. Dr. Martin believes that if the headaches were caused by some neurologic damage then there would be some objective findings in the neuropsychological testing and/or the MRI of the brain. Dr. Black's neuropsychological testing found no evidence of brain injury. Dr. Martin believes the headaches are more likely caused by depression plaintiff is suffering and that once the depressive symptoms are taken care of, the chronic headaches will also resolve. Dr. Martin is of the opinion that with proper administration of medications for the headaches, this will allow plaintiff to return to his former employment.

7.   **UNCONTESTED MATERIAL FACTS:**

1.      On February 1, 1999, plaintiff was employed as a Jones Act Seamen on the M/V SEACOR ENERGY as an engineer.

2.      On January 1, 1999, Edgar McCrory held a Coast Guard License for a Dedicated Duty Engineer ("DDE") and his rate of pay was $250.00 per day.

3.      The Coast Guard revoked plaintiff's DDE License for lack of sea time

4.      On February 1, 1999, plaintiff was a Qualified Member of the Engineering Department ("QMED") and his rate of pay was $125.00

5.      Mr. McCrory's date of birth was November 18, 1965;

6.      At the time of accident, he was employed as a QMED, but upon completion of sea time would have been entitled to reinstatement of his DDE license.

18

8.  **SINGLE LISTING OF CONTESTED ISSUES OF FACT:**

1)  Plaintiff contends that the SEACOR ENERGY was unseaworthy in at least the following respects:

   a)  The kamlock release mechanism was defective, the release ears having been broken off;

   b)  The handle of the ball valve which was counter sunk into the kamlock cap was missing;

   c)  There was a leak in the butterfly valve which was not supposed to be there;

   d)  Inadequate instruction or supervision was provided, rendering the crew itself unseaworthy through lack of training;

2)  Plaintiff contends that, in addition to the unseaworthy conditions, the defendant was guilty of negligence in:

   a)  Failing to maintain and repair;

   b)  Failing to properly instruct and supervise;

   c)  Failing to make practices and procedures available to the crewman;

   d)  Failing to warn;

   e)  Whether Mr. McCrory was ever provided with any printed material relating to the procedure to be followed when venting a bulk pneumatic tank;

   f)  Whether he ever received specific instructions on that procedure.

3)      Was the plaintiff guilty of comparative fault and was that comparative fault a cause and fact of plaintiff's accident?

     g)      Whether plaintiff should have known not to stand in front of the cam-lock cap.

     h)      Whether plaintiff could have stood behind the cam-lock cap.

     i)      Whether plaintiff should have checked the ball valve to ensure that it was not plugged.

     j)      Whether plaintiff should have requested assistance if he did not know the proper procedure.

     k)      Whether plaintiff was following the proper procedure when venting the pneumatic tanks.

4)      What part of plaintiff's body was injured in the accident of February 1, 1999?

5)      The extent and cause of plaintiff's depression and alcoholism and whether those conditions may be related to the accident of February 1, 1999.

6)      The extent and cause of plaintiff's complaints of low back pain and leg weakness, and the relationship between those conditions and the accident of February 1, 1999.

7)      The extent and cause of plaintiff's neck and cervical pain and the relationship between that condition and the accident of February 1, 1999.

8) The extent and cause of plaintiff's carpal tunnel syndrome and the relationship between that condition and the accident of February 1, 1999.

9) Whether plaintiff is suffering from post concussive syndrome.

10) Whether plaintiff has sustained any type of neurologic injury which is a cause and fact of his headaches and whether they are related to the accident of February 1, 1999.

11) The extent and nature of plaintiff's disability and what type of employment he can perform in the future.

**Personal injuries alleged by plaintiff have been set out in Section 6, supra.**

Special damages are as follows:

1) Dr. Fawaz Abdrabbo - followup care for alcoholism - $1,240.00;

2) Susan Andrews, M.D. - neuropsychological consult - $1,925.00;

3) Dr. Larry Field - shoulder treatment - $13,355.00;

4) Hardy Wilson Memorial Hospital/Copiah Wellness & Rehab - physiotherapy - $1,790.00;

5) Industrial Therapy Center of Jackson - physiotherapy - $500.00;

6) Jackson Anesthesia Associates - anesthesia - $832.00;

7) Jefferson Radiology, SPECT scan - $150.00;

8) Dr. John Long (Copiah Medical Associates/Hazelhurst Clinic) - initial treatment - $543.00;

9) Dr. Robert McGuire (University Orthopedics) - consult - $155.00;

10) Medical Arts East Surgery Center/Baptist Hospital - 7/31/00 - arthroscopy - $6,557.00;

11) Metro Physical Therapy - physiotherapy - $2,305.00;

12) Dr. David Mielke - Tulane University Hospital - Psychiatrist - $1,975.00;

13) Mississippi Baptist Medical Center - Inpatient treatment for alcohol dependency - $14,621.46;

14) Mississippi Diagnostic Imaging Center - diagnostics - $6,160.00;

15) Dr. D.C. Mohnot - treatment for headaches - $2,695.00;

16) Medications - 2/08/99 - 07/31/00 - $10,571.54;

17) River Oaks Hospital - 7/28/99 - Arthroscopy - $5,845.60;

18) South Cameron Memorial Hospital - emergency room - $771.80;

19) University Medical Center - emergency room visits - $6,253.59;

20) University Radiology Associates - CT scan/myelogram - $679.00;

21) Dr. Wee - neurology treatment - $1,085.00;

22) West Jefferson Medical Center - brain SPECT - $1,216.00;

23) Clearview Medical Imaging MRI - $580.00;

24) University Anesthesia Service - Jackson - anesthesiology, Dr. T. Tsang, nerve blocks - $572.00;

25) King's Daughter Hospital, Brookhaven, Mississippi - FCE - $750.00.

**TOTAL - $83,147.99**

9.    **SINGLE LISTING OF THE CONTESTED ISSUES OF LAW:**

1)    Whether pre-judgment interest is due because of the unseaworthy condition;

2)    All legal issues implicit in the contested issues of fact;

3)    Whether damages are due for failure to pay maintenance and cure;

4)    Whether a presumption arises that the accident caused the injury when symptoms arise shortly after the accident, when plaintiff was symptom free before.

10.    **EXHIBITS:**

**PLAINTIFF:**

a.    **Exhibits to be admitted without objection:**

1)    Emergency Room record, South Cameron Hospital;

2)    Seacor Marine personnel file, particularly with reference to W-2 and other earning records, and including pre-employment physical records;

3)    Bulk Mud and Cement Transfer Procedures;

4)    Report of Marine Accident, Injury or Death;

5)    Personal Incident Report/Vessel Incident Report;

6)    Seacor Marine Safety Training and Instruction Manual;

7)    Logs of the SEACOR ENERGY;

8)    All records of maintenance and cure payments made to plaintiff;

9)    Plaintiff's income tax records;

10)    Plaintiff's U.S. Coast Guard license;

11)    Certain photographs of the accident site produced at a 30(b)(6) deposition;

12)    Certain plans of the vessel M/V SEACOR ENERGY and its pneumatic bulk tanks, gauges, vents, float tubes, etc., as used during discovery;

13)    Much of the medical expense has been paid by the Jones Act employer, albeit in certain instances after significant delay. It is not certain what invoices might be the subject of inquiry, but all of the medical expenses were listed specifically in the original Exhibit List, and at this time, exceed $83,147.99;

14)    Various statements and bills listed in Section 8;

15)    Any other exhibit listed by any other party.

**Defendant objects to the following plaintiff's exhibits:**

16)    Memos from Mary Liles, Mike Conner and Howard Duncan, particularly relating to maintenance and cure claim;

17)    An exemplar of a kamlock cap, a ball valve, and certain photos relative thereto;

## SEACOR'S EXHIBIT LIST

1)    Bulk Mud & Cement Transfer Procedures;

2)    Personnel File of Edgar McCrory;

3)    M/V SEACOR ENERGY logs;

4)    Report of Marine Accident, Injury or Death; Alleged Personal Incident
      Report/Vessel Incident Report;

5)    Pneumatic Specialties, Inc. Invoice No. 7934;

6)    Wage Earnings Information;

7)    Seacor Safety Manual;

8)    Earnings information received per authorization;

9)    IRS records;

10)   Military records;

11)   McCrory scholastic records;

12)   Photos;

13)   Certain plans of the vessel M/V SEACOR ENERGY and its pneumatic
      bulk tanks, gauges, vents, float tubes, etc., as used during discovery;

14)   Any exhibit produced in discovery;

15)   Any exhibit used or listed by any other party; and

16)   Any exhibit attached to any deposition.

**The following may be subject to objection:**

There are numerous medical records which have been referenced in the plaintiff's and
defendant's Witness Lists.  Only portions of such documents may be admissible, and only
under certain circumstances.  The admissibility of these items will be subject to a proper
foundation being laid.  These records have been exchanged between the parties, and, with
the Court's permission, will be addressed specifically when and if they become pertinent.

These records, as listed in the original Exhibit List, are as follows:

1) Medical records and charges of South Cameron Hospital Emergency Room;

2) Medical records and charges from Hardy Wilson Memorial Hospital/Copiah Wellness & Rehabilitation;

3) Medical records, reports and charges of Dr. John Long, Copiah Medical Associates;

4) Medical records, reports and charges of Dr. Larry Field;

5) Medical records, reports and charges of River Oaks Hospital;

6) Medical records, reports and charges of Dr. D. C. Mohnot, New Orleans Headache and Neurology Clinic;

7) Medical records, reports and charges of Mississippi Baptist Chemical Dependency Center, Mississippi Baptist Health Systems;

8) Medical records, reports and charges of Dr. Fawaz Abdrabbo ;

9) Medical records, reports and charges of MS Diagnostic Imaging Center;

10) Medical records, reports and charges of Dr. Susan Ring Andrews;

11) Medical records, reports and charges of West Jefferson Medical Center;

12) Medical records, reports and charges of Industrial Therapy Center of Jackson;

13) Medical records, reports and charges of University Medical Center at Jackson;

14) Medical records, reports and charges of Dr. John Claypool;

15) Medical records, reports and charges of Clearview Medical Imaging;

16) Medical records, reports and charges of MAE Physicians' Surgical Center, LLC, Mississippi Baptist Health Systems;

26

17)    Records and report of Terry L. Sayne, R.N. (to the extent admissible);

18)    Records and report of Concentra Managed Care (to the extent admissible);

19)    Medical records from Singing River Hospital;

20)    Medical records, reports and charges of Mississippi Baptist Medical Center

21)    Records of pre-employment physical exam;

22)    Medical records, reports and charges of Metro Physical Therapy, Greenville, Mississippi;

23)    Medical records, reports and charges of Dr. Robert A. McGuire, Jr.;

24)    Medical records, reports and charges of Dr. Abel Wee;

25)    Medical records, reports and charges of pain management clinic and/or physician as prescribed by Dr. Abel Wee;

26)    Medical records and reports of Dr. David Mielke;

27)    Medical records and reports of Dr. Brian Tsang, University Anesthesia Services;

28)    FCE reports, Kings Daughters Hospital;

29)    Medical records and reports of Jackson Anesthesiology;

30)    Medical records and reports of Jefferson Radiology;

31)    Medical records and reports University Radiology;

32)    Dr. Charles Johnson's records;

33)    Dr. William Black's records;

34)    Dr. William A. Martin's records;

35)    Dr. John Thompson's records.

11.    a.    **LIST OF DEPOSITION TESTIMONY:**

Plaintiff may introduce depositions in lieu of the appearance of the following:

1)    Gerald Daigle, chief engineer - SEACOR ENERGY;

2)    Henry Charles McCann, SEACOR corporate representative, under cross examination;

3)    Dr. Larry Field - Jackson, Mississippi - treatment of shoulder;

4)    Dr. Able Wee - Jackson, Mississippi - neurological treatment;

5)    Dr. Robert A. McGuire, Jr. - orthopaedic consult;

6)    Ms. Corinne Queen Sampson - attending physiotherapist;

7)    Dr. John Long - treating physician;

8)    C.J. Lumbas, Seacor representative - cross examination.

**DEFENDANT, SEACOR MARINE, INC.:**

1)    Gerald Daigle, chief engineer - SEACOR ENERGY;

2)    Dr. Larry Field - Jackson, Mississippi - treatment of shoulder;

3)    Dr. Able Wee - Jackson, Mississippi - neurological treatment;

4)    Dr. Robert A. McGuire, Jr. - orthopedic consult;

5)    Ms. Corinne Queen Sampson - attending physiotherapist;

6)    Dr. John Long - general practitioner; and

7)    Any other witness who is not available for trial.

b.    In non-jury trials, the parties shall, at least five days prior to trial, submit to the Court:

A summary of what each party intends to prove and convey to the Court by the deposition testimony, including, where appropriate, particular page and line reference to said depositions. The parties shall indicate to the Court by page and line numbers, those parts of the deposition which each party intends to use, and upon which each party shall rely, in proving their respective cases.

12.   a.   **LIST AND BRIEF DESCRIPTION OF CHARTS, GRAPHS, MODELS, SCHEMATIC DIAGRAMS, ETC.**

Plaintiff may use anatomic models or diagrams, witness drawings, vessel blueprints, and, relative to economic testimony, charts.

Seacor may use photographs, charts or models of the valves and risers of the work area surrounding them which are the subject of this litigation.

   b.   **STIPULATIONS OR OBJECTIONS TO USE OF THE LISTED OBJECTS:**

None other than noted above.

13.   a.   **LIST OF WITNESSES:**

**PLAINTIFF:**
**Will call:**

1.   Edgar F. McCrory, III, plaintiff - to testify on all aspects of the case

2.   Wanda McCrory, his wife - to testify about plaintiff's physical condition limitations, etc.

3.   Gerald Daigle
     Milton, Florida
     Engineer aboard SEACOR ENERGY, under cross-examination, by deposition, on facts surrounding the condition of the vessel, company policy, training and the accident itself.

29

4.      Henry Charles McCann
        Houston, Texas
        Director of Safety and Loss Control, Seacor, to testify as to company policy,
        procedures, especially relative to venting of bulk tanks, and plaintiff's
        personnel record, under cross-examination by deposition

5.      Dr. Larry Field
        1325 East Fortification Street
        Jackson, Mississippi
        Expert orthopaedist, as to care and treatment of the plaintiff, particularly his
        left shoulder, including disabilities and physical limitations, by deposition

6.      Dr. D.C. Mohnot
        1111 Medical Center Boulevard
        Marrero, Louisiana
        Neurologist, to testify about the care and treatment of the plaintiff, particularly
        with reference to headaches

7.      Dr. Susan Ring Andrews
        3525 N. Causeway Boulevard
        Metairie, Louisiana
        To testify re: neuropsychological evaluation

8.      Dr. David Mielke
        Psychiatry, Tulane University Medical Center
        1440 Canal Street - 10th Floor
        New Orleans, Louisiana 70112
        To testify about the psychiatric condition and treatment of plaintiff

9.      Dr. A.S. Wee
        University of Neurology Group
        2500 N. State Street
        Jackson, Mississippi
        Neurologist to testify as to the diagnosis, care and treatment of a compression
        fracture of the 5th lumbar vertebra, and its relationship to the subject accident.

10.     Thomas Dalton, Ph.D.
        **Forensic Economics Corporation**
        820 O'Keefe Avenue, Suite 200
        New Orleans, Louisiana 70113
        Forensic economist, to testify as to past lost wage, loss of earning capacity and
        discounted value of various fringe benefits

11.     Thomas J. Meunier, Jr.
        433 Metairie Road
        Metairie, Louisiana
        Vocational rehabilitation counselor, to testify as to the possible future
        employability of the plaintiff

12.     Corinne Queen Sampson
        Copiah Wellness and Rehabilitation
        Hazelhurst, Mississippi
        Physiotherapist to testify as to symptoms and complaints of the plaintiff and
        the physiotherapy administered at her facility, by deposition


The following witnesses may be produced:

1.      Brooke McCrory, Wesson, Mississippi - plaintiff's daughter, as to his physical
        conditions and limitations;

2.      Catherine Juilleratte, Hazelhurst, Mississippi - plaintiff's aunt, as to this
        physical conditions and limtations;

3.      Timmy M. Foret, under cross-examination, captain of the SEACOR
        ENERGY;

4.      Spencer Frederick, under cross-examination, an engineer on the SEACOR
        ENERGY;

5.      Dr. Fawaz Abdrabbo, 1151 N. State Street, Jackson, Mississippi, psychiatrist,
        administrator of the detoxification program in April and May, 1999;

6.      Dr. Robert A. Maguire, Jr., Jackson, Mississippi, consulting orthopaedist, by
        deposition;

7.      John W. Thompson, Jr., M.D., Tulane University Medical Center, psychiatrist
        designated as expert by the defendant, who may be called in the plaintiff's
        case in chief under cross-examination;

8.      Charles Theriot, CPA, Houma, Louisiana, the designated economic expert of
        the defendant, who may be called under cross-examination in the plaintiff's
        case in chief;

9.      Terry L. Sayre, R.N., medical case manager, Consentra Managed Care, Inc.,
        Harahan, Louisiana, who reviewed medical records at the request of the
        defendant;

10.  Mary Catherine Elvir, Metairie, Louisiana, vocational rehab counselor designated by defendant.

11.  Dr. John Long, family physician, by deposition;

12.  C.J. Lombas - 30(b)(6), corporate representative of Seacor Marine, Inc. under cross examination - by deposition;

13.  Ruth Ann Mathis, MSPT - Industrial Therapy, Jackson, Mississippi;

14.  Wayne Jiminez, MSPT - Industrial Therapy, Jackson, Mississippi;

15.  Physical therapist from King's Daughter Hospital who will perform FCE;

16.  Brian Tsang, M.D. - nerve blocks;

17.  Any other witnesses listed or called by defendant, Seacor Marine, Inc.

## SEACOR'S WITNESS LIST

Seacor will call the following witnesses at the trial of this matter.

1.  Timmy M. Foret
    1052 Haley Road
    De Quincy, LA 70633

    Timmy Foret was the captain onboard the M/V SEACOR ENERGY at the time of the accident. He may give testimony regarding the facts and circumstances of the accident and the operation of the SEACOR ENERGY.

2.  Dr. William A. Martin
    3434 Prytania Street - Suite 230
    New Orleans, LA 70115

    Dr. Martin is a neurologist who conducted an evaluation on plaintiff behalf of Seacor. He may give testimony regarding his examination and his opinions about plaintiff.

3.  Dr. John W. Thompson, Jr., M.D.
    Tulane Medical Center
    1440 Canal Street TB53
    New Orleans, LA 70112

Dr. Thompson is a psychiatrist who conducted an evaluation on plaintiff on behalf of Seacor. He may give testimony regarding plaintiff's psychiatric condition and its relationship to the accident of February 1, 1999.

4.     Dr. F. William Black, Ph.D.
       Tulane Medical Group
       1440 Canal Street TB 52
       New Orleans, LA 70112

       Dr. Black is a neuropsychologist who conducted neuropsychological testing on the plaintiff at the request of Seacor. He may give testimony regarding results of that testing and his opinions regarding plaintiff's condition.

5.     Dr. Charles L. Johnson
       Orthopedic/Sports Medicine
       Arthroscopic and Knee Surgery
       3800 Houma Blvd. - Suite 260
       Metairie, LA 70006

       Dr. Johnson is an orthopedist who conducted an orthopedic medical evaluation of plaintiff at the request of Seacor. He may give testimony regarding plaintiff's medical conditions and his opinions thereon.

6.     Mary Elvir and/or Kelly Roberts
       5020 Utica Street
       Metairie, LA 70006

       Ms. Elvir and/or Ms. Roberts are a vocational rehabilitation counselors who evaluated plaintiff on behalf of Seacor. They may give testimony regarding job opportunities available to plaintiff, potential earnings, and the demands of an engineer onboard vessels.

7.     Charles Theriot, C.P.A.
       306 Grinage Street
       Houma, LA 70360

       Mr. Theriot is a economist who conducted an evaluation of plaintiff's potential loss wages. He may give testimony regarding his opinions of those losses.

33

Seacor may call the following witnesses at the trial of this matter.

1.      Mary Liles
        Seacor Marine, Inc.
        5005 Railroad Avenue
        Morgan City, LA 70380

        Ms. Liles may give testimony regarding the payment of
        maintenance and cure to plaintiff.

2.      Carlos Foss
        104 Edeker Circle
        Jay, FL 32565

        Captain Foss was the captain onboard the SEACOR ENERGY
        at the time of the accident.  He may give testimony regarding
        the facts and circumstances of the accident and the operation of
        the SEACOR ENERGY.

3.      Gerald Daigle
        4628 Watermill Road
        Jay, FL 32565

        Mr. Daigle was the engineer onboard the SEACOR ENERGY
        at the time of the accident.  He may give testimony regarding
        the facts and circumstances of the accident and the operation of
        the SEACOR ENERGY.

4.      Spencer Frederick
        111 Edy Ann Drive
        Apt. 119
        Lafayette, LA 70508

        Mr. Frederick was an engineer onboard the SEACOR ENERGY
        prior to the time of the accident. He may give testimony
        regarding the operation of the vessel and instructions provided
        to the plaintiff regarding the venting of the pneumatic tanks.

5.      Dr. Abelardo Wee
        University of MS Clinical Science Bldg.
        2500 N. State Street
        Jackson, MS 39216

Dr. Wee treated plaintiff for his complaints of low back pain and radiating weakness into both lower extremities and he may give testimony (by deposition) regarding his opinions.

6.      Dr. Larry Fields
        MS Sports Medicine & Orthopaedic Center
        1325 East Fortification Street
        Jackson, MS 39202

        Dr. Fields performed two shoulder surgeries on plaintiff and he may give testimony (by deposition) regarding the relationship of those surgeries to the accident of February 1, 1999 and plaintiff's disability.

7.      Dr. John Long
        Copiah Medical Associates
        233 Caldwell Drive
        Hazelhurst, MS 39083

        Dr. Long treated plaintiff following the accident and he may give testimony (by deposition) regarding the accident and he may give testimony regarding plaintiff's various complaints following the accident.

8.      Dr. Robert McGuire
        University of Mississippi Medical Center
        2500 N. State Street, Room UO-20
        Jackson, MS 39216

        Dr. McGuire is the orthopaedist who treated plaintiff at the request of Dr. Wee. He may give testimony regarding his treatment rendered to plaintiff and his opinions regarding that treatment.

9.      C. J. Lombas
        Seacor Marine, Inc.
        5005 Railroad Avenue
        Morgan City, LA 70380

        Mr. Lombas is the port captain at Seacor in charge of the SEACOR ENERGY. He may give testimony regarding the operation of the vessel and Seacor's policies and procedures.

35

10. Chuck McCann
    Seacor Marine, Inc.
    5005 Railroad Avenue
    Morgan City, LA 70380

    Mr. McCann was in charge of safety at Seacor and he may give testimony regarding Seacor's policies and procedures and employment availability at Seacor.

11. Ms. Corinne Queen Sampson - attending physiotherapist

12. Rich Little, Engineer, Seacor Marine, Inc., may testify as to job description and requirements of engineer.

b.  The witness list was filed in accordance with prior court orders. No other witnesses shall be allowed unless agreeable to all parties and their addition does not affect the trial date. This restriction will not apply to rebuttal witnesses or documents whose necessity cannot be reasonably anticipated. Furthermore, in the case of expert witnesses, counsel shall certify that they have exchanged expert reports in accordance with prior court orders. Expert witnesses whose reports have not been furnished opposing counsel shall not be permitted to testify nor shall experts be permitted to testify to opinions not included in the reports timely furnished.

c.  Except for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the pre-trial order and prior court orders;

d.  Counsel shall not be allowed to ask questions on cross-examination of an economic expert which would require the witness to make mathematical calculations in order to frame a response unless the factual elements of such

36

questions shall have been submitted to that expert witness not less than three full working days before trial.

14.   a.   This is a non-jury case, designated under Rule 9(h).

      b.   Suggested findings of fact and conclusions of law are _____ required, and a separate trial memorandum is _____ required. If required, they should be submitted not less than five full working days prior to trial.

15.   "The issue of liability will ____ be tried separately from that of quantum."

16.   Other matters which might expedite a disposition of the case:

      1.   Settlement conference with the magistrate is to be scheduled and may be of assistance.

17.   Trial shall commence on February 12, 2001 at 10:00 o'clock a.m. Trial should last no longer than three days, and possibly could be completed in two.

18.   This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared in person. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

19.   Possibility of settlement of this case has been and is being considered.

20.    **SIGNATURES:**

_____
A. Remy Fransen, Jr. (T.A.) (#5827)
**FRANSEN & HARDIN**
814 Howard Avenue
New Orleans, Louisiana 70113
Telephone: (504) 522-1188


_____
John W. Robinson (#11350)
1515 Lafayette Street
Gretna, Louisiana 70053
Telephone: (504) 362-6214
        **ATTORNEYS FOR PLAINTIFF,**
            **EDGAR F. McCRORY, III**


_____
William B. Hidalgo, T.A. (#20220)
William B. Schwartz (#11854)
**BURKE & MAYER**
1100 Poydras Street - 20th Floor, Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 569-2900
        **ATTORNEYS FOR DEFENDANT,**
            **SEACOR MARINE, INC.**


DISTRICT JUDGE